**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 14, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

---

CURTIS EDWARD MCCARTY,

        Plaintiff - Appellant,

v.

JOYCE A. GILCHRIST, in her official capacity; WILLIAM CITTY, Chief of Police, City of Oklahoma City, in his official capacity; CITY OF OKLAHOMA CITY,

        Defendants - Appellees.

No. 09-6220

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:07-CV-01374-C)**

---

R. Thomas Seymour (Scott A. Graham and Anthony L. Allen with him on the brief), Seymour & Graham, LLP, Tulsa, Oklahoma, for Plaintiff-Appellant.

Richard C. Smith, Assistant Municipal Counselor (Kenneth Jordan, Municipal Counselor, with him on the brief), Oklahoma City, Oklahoma, for Defendants-Appellees.

---

Before **BYE**, **COLLOTON**, and **SHEPHERD**, Circuit Judges.[*]

---

    [*]The Honorable Kermit E. Bye, The Honorable Steven M. Colloton, and The Honorable Bobby E. Shepherd, Circuit Judges, United States Court of Appeals for the Eighth Circuit, sitting by designation.

---

**SHEPHERD**, Circuit Judge.

---

Curtis McCarty brought this 42 U.S.C. § 1983 action against Joyce Gilchrist, former forensic chemist for the Oklahoma City Police Department (OCPD), William Citty, OCPD Chief of Police, and the city of Oklahoma City. McCarty's complaint alleged constitutional violations and damages under theories of malicious prosecution, municipal liability for failure to train or supervise, and supervisor liability for failure to train or supervise. McCarty appeals from the district court's adverse grant of summary judgment, and we affirm.

## I.

In 1986, McCarty was charged in Oklahoma state court with the first-degree murder of eighteen-year-old Pam Willis. After a jury trial, McCarty was convicted and sentenced to death. McCarty appealed, and the Oklahoma Court of Criminal Appeals (OCCA) reversed. McCarty v. State, 765 P.2d 1215, 1222 (Okla. Crim. App. 1988). Specifically, the OCCA held that the State deprived McCarty of a "fair and adequate opportunity to have critical hair evidence examined by an independent forensic expert" and of an accurate forensic report necessary for intelligent cross-examination. Id. at 1217-18. In addition, the OCCA found that Gilchrist testified beyond the limitations of forensic science when she stated that McCarty was physically present during the murder. Id. at 1218-19. Gilchrist also

testified without personal knowledge that the medical examiner had used certain procedures and had found a scalp hair consistent with McCarty's hair in the victim's chest wound.  Id. at 1219-20.  More improper testimony occurred when a police officer described an "extrajudicial experiment" he conducted.  Id. at 1220. Finally, the OCCA held that various instances of prosecutorial misconduct occurred during the trial.  Id. at 1220-21.  Assistant District Attorney Barry Albert improperly criticized the Cleveland County District Attorney's Office for recommending that McCarty receive only five years upon his entry of a guilty plea on a previous second-degree rape charge.  Id. at 1221.  Then, during closing argument, District Attorney Robert Macy commented on facts not in evidence, stated his personal views regarding McCarty's guilt in front of the jury, attacked the credibility of defense counsel, and requested sympathy for the victims while urging the jury to impose the death penalty.  Id. at 1220-21.  Finding the record "replete with error," the OCCA reversed McCarty's conviction and remanded to the District Court of Oklahoma County for a new trial.  Id. at 1222.

McCarty was retried in 1989.  The jury again convicted McCarty of first-degree murder and sentenced him to death.  On appeal, the OCCA affirmed the conviction but reversed the death sentence because the District Court of Oklahoma County had refused to instruct the jury on the alternative sentencing option of life imprisonment without parole.  McCarty v. State, 904 P.2d 110, 129 (Okla. Crim. App. 1995).  The case was remanded for resentencing.  Id.  In 1996, McCarty was

sentenced to death for the third time, and the OCCA affirmed.  McCarty v. State,
977 P.2d 1116, 1141 (Okla. Crim. App. 1998).

McCarty then applied to the OCCA for postconviction relief, alleging that
the informants who testified against him were unreliable, that the criticism of
Macy's trial practices in various judicial opinions showed that his conviction was
inherently unreliable, and that his counsel had been ineffective.  McCarty v. State,
989 P.2d 990, 993-96 (Okla. Crim. App. 1999).  The OCCA denied his application.
Id. at 996.

In 2001, the FBI launched an investigation into Gilchrist's forensic work,
this court concluded Gilchrist had fabricated evidence in Mitchell v. Gibson, 262
F.3d 1036 (10th Cir. 2001), and Gilchrist was fired.  See Pierce v. Gilchrist, 359
F.3d 1279, 1283-84 (10th Cir. 2004) (providing an overview of Gilchrist's
improper actions as an OCPD forensic chemist).  As a result, McCarty again
applied to the OCCA for postconviction relief.  McCarty v. State, 114 P.3d 1089
(Okla. Crim. App. 2005).  This time, the State consented to an evidentiary hearing
on McCarty's petition because the allegations centered on Gilchrist and her "now
notorious actions."  Id. at 1090 & n.1.  The OCCA thus remanded the case to the
District Court of Oklahoma County for an evidentiary hearing.  Id. at 1090 & n.3.
The District Court of Oklahoma County found that Gilchrist "most likely lost or
intentionally destroyed" exculpatory or inculpatory evidence, "provided flawed
laboratory  analysis and documentation of her work," gave expert testimony that

-4-

"exceeded the acceptable limits of forensic science," and "altered lab reports and handwritten notes" to hide her actions. Id. at 1092. Based on these findings, the District Court of Oklahoma County concluded that McCarty did not receive a fair trial in 1989 and submitted this recommendation to the OCCA. Id. The OCCA agreed, holding that "Gilchrist's actions alone warrant a new trial" and reversing McCarty's conviction. Id. at 1094-95. The OCCA declined to dismiss the charges against McCarty outright, however, finding that reasonable minds could differ on the question of McCarty's guilt. Id. at 1095. "While the revelations relating to Ms. Gilchrist are clearly damaging to this largely circumstantial case, they are not necessarily fatal." Id., cert. denied, 546 U.S. 1020 (2005). Accordingly, the OCCA remanded the case to the District Court of Oklahoma County for a new trial. Id. at 1094-95.

On remand, the District Court of Oklahoma County held a hearing on May 10-11, 2007, to discuss the status of the case and to rule on the parties' various pre-trial motions. At the close of the hearing, the court found that in 2000, Gilchrist had intentionally destroyed the potentially exculpatory hair evidence recovered from the victim's chest and inside the victim's chest wound. The court concluded that this finding required dismissal of the charges against McCarty. See Hogan v. State, 877 P.2d 1157 (Okla. Crim. App. 1994) (adopting Arizona v. Youngblood, 488 U.S. 51 (1988), which holds that the intentional destruction of potentially exculpatory evidence by law enforcement is a due process violation).

McCarty was released from prison after spending almost 19 years on death row.

McCarty brought a civil suit under § 1983 in the U.S. District Court for the Western District of Oklahoma on the theories of malicious prosecution,[2] municipal liability for failure to train or supervise, and supervisor liability for failure to train or supervise. The district court dismissed the complaint with prejudice, ruling that McCarty's § 1983 claims accrued when his conviction was reversed on July 14, 2005, and his lawsuit, filed December 5, 2007, was barred by the two-year statute of limitations. On McCarty's motion, the district court permitted him to file an amended complaint alleging an ongoing conspiracy that continued until all charges against him were dismissed in 2007. After discovery, the district court granted summary judgment in favor of the defendants, concluding that McCarty's claims were barred by the statute of limitations, or alternatively, failed as a matter of law. McCarty appeals.

## II.

A. *Standard of Review*

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. Vaughn v.

_____

[2]McCarty's complaint alleged numerous violations of his constitutional rights by Gilchrist and by a conspiracy between Gilchrist, the OCPD, and Oklahoma City. The district court construed these allegations as raising a § 1983 malicious prosecution claim because McCarty explicitly stated in a responsive motion that "[t]his case is akin to a malicious prosecution claim and nothing else." McCarty does not dispute this characterization.

Epworth Villa, 537 F.3d 1147, 1150 (10th Cir. 2008), cert. denied, 129 S. Ct. 1528 (2009).  Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Id.  "[W]e may affirm on any basis supported by the record, even though not relied on by the district court."  Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).

B. *Section 1983 Malicious Prosecution Claims*

Section 1983 provides a federal civil remedy for the "deprivation of any rights, privileges, or immunities secured by the Constitution" by any person acting under color of state law.  42 U.S.C. § 1983.  The analysis in a § 1983 case begins with the identification of the precise constitutional right allegedly infringed.  Graham v. Connor, 490 U.S. 386, 394 (1989).  Here, McCarty seeks damages under a theory of § 1983 malicious prosecution for several distinct alleged violations of his constitutional rights under the procedural component of the Due Process Clause.  Specifically, McCarty alleges that: (1) Gilchrist falsely testified that hairs found on the victim's chest and in the victim's chest wound were consistent with McCarty's hair; (2) Gilchrist falsely testified that McCarty could not be excluded as the source of the semen in the victim; (3) Gilchrist and others withheld evidence that a bloody print found on the victim's thigh was actually a footprint that did not belong to McCarty; (4) Gilchrist falsely testified that no hairs were discovered on the rope used to strangle the victim; (5) Gilchrist intentionally destroyed potentially exculpatory evidence in 2000; and (6) Gilchrist

and the OCPD conspired to prosecute him wrongfully.

In addition to alleging a constitutional violation, a § 1983 plaintiff must prove other tort elements. <u>Novitsky v. City of Aurora</u>, 491 F.3d 1244, 1257-58 (10th Cir. 2007). These elements are often established by analogy to common law torts, but the elements of an analogous common law tort are informative, not dispositive. <u>Becker v. Kroll</u>, 494 F.3d 904, 913-14 (10th Cir. 2007). When a common law tort is sufficiently analogous to a constitutional tort, however, its elements may dovetail with a particular constitutional violation to form an analytical framework. <u>Id.</u>

This Court has analogized a § 1983 malicious prosecution claim to the common law tort of malicious prosecution in articulating its elements:

> The elements of the common law tort of malicious prosecution, as applicable in a § 1983 claim, are: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.

<u>Novitsky</u>, 491 F.3d at 1258. Although <u>Novitsky</u> holds that lack of probable cause is an element of § 1983 malicious prosecution, McCarty argues that <u>Novitsky</u> does not apply to this case, and relying on <u>Pierce v. Gilchrist</u>, 359 F.3d 1279 (10th Cir. 2004), asserts that he is not required to prove lack of probable cause.

We disagree with McCarty's characterization of the <u>Pierce</u> decision. <u>Pierce</u> expressly left open the issue of whether an absence of probable cause is required

for § 1983 malicious prosecution claims. Id. at 1294. Because neither party disputed that the constitutional tort of malicious prosecution requires an absence of probable cause, the Pierce Court assumed that it did, observing that the plaintiff would "bear the heavy burden" of proof on remand. Id. at 1294-95. Moreover, in Novitsky and Wilkins v. DeReyes, this Court clearly stated that the constitutional tort of malicious prosecution requires the plaintiff to prove lack of probable cause. Novitsky, 491 F.3d at 1258; Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir. 2008), cert. denied, 129 S. Ct. 1526 (2009).

McCarty attempts to distinguish the present case because the § 1983 malicious prosecution claims in Novitsky and Wilkins were based on the Fourth Amendment whereas his claims are based on the Fourteenth Amendment. Pierce, which included both Fourth and Fourteenth Amendment claims, indicated that no such distinction exists. See Pierce, 359 F.3d at 1296 n.11. Accordingly, McCarty's theory of malicious prosecution requires proof of lack of probable cause.

Based on Fourth Amendment probable cause principles and viewing the evidence in the light most favorable to McCarty, the State had probable cause to prosecute McCarty. The substance of probable cause is a "reasonable ground for belief of guilt." Mink v. Knox, 613 F.3d 995, 1003 (10th Cir. 2010) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). Probable cause exists if the facts and circumstances are sufficient to warrant a person of reasonable caution to

-9-

believe a crime has been committed. Id. If evidence is falsified or withheld, the probable cause determination is made by considering whether, excluding the falsified inculpatory evidence or including the withheld exculpatory evidence, probable cause existed to prosecute. See Pierce, 359 F.3d at 1295.

For purposes of the probable cause determination, we consider whether the evidence supported a reasonable belief in McCarty's guilt: (1) without Gilchrist's testimony that the hairs found on the victim's chest and in the chest wound were consistent with McCarty's hair; (2) with McCarty excluded as the source of the semen in the victim; (3) with the withheld evidence that the bloody footprint on the victim's thigh was not McCarty's; (4) with evidence that the hairs discovered on the rope used to strangle the victim were not McCarty's; and (5) with evidence that the hairs destroyed by Gilchrist, which were found on the victim's chest and in the chest wound, were not McCarty's. We conclude that despite the egregiousness of Gilchrist's alleged actions in this case, the State's theory of the case and the additional evidence against McCarty supported a reasonable belief in McCarty's guilt.

Based on the medical examiner's conclusion that Willis's death was caused by both stab wounds and asphyxiation, the State theorized from the beginning of the case that two individuals committed the crime. In addition, other physical evidence in the record implicated McCarty in Willis's death. McCarty's fingerprint was found on a vase on a coffee table at the crime scene, and Willis's

roommate testified that she cleaned the vase the morning of the murder. <u>McCarty</u>, 904 P.2d at 117. The rope used to strangle the victim and found wrapped around her neck matched those manufactured for the Air Refiners Plant where McCarty worked. <u>Id.</u>

Further, witness statements supported a reasonable belief in McCarty's guilt. Testimony from several individuals placed McCarty in the vicinity of the crime scene the night of the murder. <u>Id.</u> at 117-18. Several witnesses also recounted statements McCarty made implicating himself in the crime. Gerald Griffin testified that he had a conversation with McCarty about the murder of a girl. <u>Id.</u> at 118. McCarty told Griffin that he and a friend had gone to the girl's house to sell her acid and then left, but later his friend went back to the house and killed the girl after she overdosed. <u>Id.</u> Another witness, Cindy Parks, testified that she had a conversation with McCarty in which he stated the police had released incorrect information regarding Willis's death. <u>Id.</u> Parks stated that McCarty told her he had been paid to kill Willis for "burning" someone on a drug deal. <u>Id.</u> He said he had gone to the house while Willis was sleeping, slashed her throat, smoked a cigarette, and then left, but that he had not sexually assaulted her. <u>Id.</u> Theodore Elgin testified that he overheard McCarty discussing the murder of a girl with other inmates while both were being held in the Oklahoma County Jail. <u>Id.</u>

Finally, McCarty gave conflicting statements to the police regarding his

whereabouts and activities the night of the murder.  When the police first interviewed McCarty, he stated that Willis's roommate called him the night before the murder and asked him to obtain acid for Willis.  Id. at 119.  Two friends, Chas Kelly and Shawn McCarthy, arrived at his house while he was trying to access the requested drugs, and later they went to Willis's house to deliver the drugs.  Id. The three men were there for a short time, and then they left for band practice.  Id. The second time the police interviewed McCarty, he provided the same account of the day before the murder.  Id.  This time, however, he also stated that he went to Willis's house the night of the murder.  Id.  He and a friend named Steve had gone to Willis's house to sell her more acid, but Willis said she had already made plans to purchase acid from Shawn later that night.  Id.  McCarty left with Steve, went drinking, took drugs, and then Steve took McCarty home.  Id.  McCarty admitted during the second interview that he had told people that he knew who killed Willis, but explained that he had only been guessing.  McCarty also speculated that Shawn had killed Willis because she "burned him on the drug deal."  Id.

When the police interviewed McCarty a third time, he provided the same account of the day before the murder.  Id.  He then stated that he had gone to Willis's house the night of the murder with his drug connection, Rick Terry, to facilitate an exchange of sex for drugs between Willis and Terry.  Id.  McCarty dropped Terry off at Willis's house and on his way back to the house, his car stalled.  Id.  When McCarty phoned Willis's house, Terry informed him that Willis

had tried to steal money and drugs from him and that McCarty should keep his mouth shut about the incident.  Id.  These varying accounts provided by McCarty, along with the physical evidence and witness statements, support a reasonable belief in McCarty's guilt.

McCarty nevertheless contends that probable cause was retroactively vitiated when a 2007 DNA test of the genetic material recovered from underneath Willis's fingernails excluded him as a major contributor.  This evidence was not available at the time McCarty was initially prosecuted, however, and the assessment of probable cause is directed at the time of prosecution.  Pierce, 359 F.3d at 1294 ("Probable cause must be evaluated as of the events in question."). To the extent McCarty's argument extends to his post-2005 prosecution, the 2007 DNA test results do not undermine probable cause.  The 2007 DNA test excluded McCarty as a major contributor, but it did not exclude him as a minor contributor. Although McCarty attributes this fact to the 15-year gap between collection and testing of the genetic material, the State's interpretation of the results—that they support the two-perpetrator theory—is a reasonable explanation supporting a continued belief in McCarty's guilt.

McCarty makes an additional argument with respect to his § 1983 malicious prosecution claim for the alleged intentional destruction of potentially exculpatory

evidence.[3]  Relying on <u>Pierce</u>, McCarty argues that the nature of the constitutional

violation changes the analysis of whether he can prove that no probable cause

existed to prosecute him.  Specifically, McCarty asserts that the requirement is met

here because <u>Youngblood</u> requires dismissal of all charges when potentially

exculpatory evidence is destroyed, and thus probable cause to prosecute him

"simply disappear[ed]" the instant Gilchrist destroyed evidence in 2000.

This argument conflates two elements of § 1983 malicious prosecution.  The

<u>Youngblood</u> violation satisfies the constitutional violation element of malicious

prosecution, but McCarty must also prove the separate element of the absence of

probable cause to prosecute.  McCarty alleges that Gilchrist destroyed the slides

containing the hairs found on the victim's chest and in the chest wound, so we

assume that the hairs were not McCarty's and remove Gilchrist's testimony

regarding the hairs from the probable cause equation.  <u>See</u> <u>Pierce</u>, 359 F.3d at

1295.  Thus, McCarty's claim based on <u>Youngblood</u> fails for the same reason his

_____

[3]Because the parties agree that Gilchrist's actions in 2000 violated McCarty's constitutional rights, we assume that the <u>Youngblood</u> decision, which addressed a defendant's due process rights in the preconviction context, applies equally to a defendant's due process rights in the postconviction context.  <u>Compare</u> <u>Yarris v. Cnty. of Del.</u>, 465 F.3d 129, 142 (3d Cir. 2006) (holding that although <u>Youngblood</u> addressed preconviction government conduct, its analysis of the defendant's due process right to access evidence applied to postconviction government conduct), <u>with</u> <u>Dist. Attorney's Office for the Third Judicial Dist. v. Osborne</u>, 129 S. Ct. 2308, 2319 (2009) ("The Court of Appeals went too far, however, in concluding that the Due Process Clause requires that certain familiar preconviction trial rights be extended to protect Osborne's postconviction liberty interest.").

other malicious prosecution claims fail—other evidence supported a reasonable belief in his guilt given the State's theory of the crime.

In addition, McCarty's argument ignores the fact that the appropriate remedy for a <u>Youngblood</u> violation has not been determined by the Oklahoma courts, and as evidenced by the split of authority on the question, it was not a foregone conclusion that dismissal would be required. Some courts have held, as McCarty contends, that the only remedy for the bad faith destruction of potentially exculpatory evidence under <u>Youngblood</u> is the dismissal of all charges. <u>See, e.g.</u>, <u>State v. Lang</u>, 862 P.2d 235, 245 (Ariz. Ct. App. 1993); <u>Lolly v. State</u>, 611 A.2d 956, 960 (Del. 1992); <u>United States v. Day</u>, 697 A.2d 31, 36 (D.C. 1997). Other courts have held, however, that alternative remedies may be appropriate. <u>See, e.g.</u>, <u>United States v. Bohl</u>, 25 F.3d 904, 914 (10th Cir. 1994) (suppression of evidence); <u>United States v. Cooper</u>, 983 F.2d 928, 932-33 (9th Cir. 1993) (suppression of evidence); <u>Stuart v. State</u>, 907 P.2d 783, 793-94 (Idaho 1995) (favorable inference under spoilation doctrine); <u>State v. Rains</u>, 735 N.E.2d 1, 6 (Ohio Ct. App. 1999) (suppression of evidence). Although the District Court of Oklahoma County ultimately concluded that dismissal of the charges against McCarty was the appropriate remedy, dismissal was not the inevitable result.

C. *Claims for Municipal Liability and Supervisor Liability*

In addition to his § 1983 malicious prosecution claims, McCarty seeks damages under theories of municipal liability for failure to train or supervise and

supervisor liability for failure to train or supervise.  Even though Gilchrist is not liable for violating McCarty's constitutional rights, the city may nevertheless be liable as a municipality for the failure to train or supervise, and Chief Citty may nevertheless be liable as a supervisor for the failure to train or supervise.  See Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010); Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1279 (10th Cir. 2009).  We do not reach the merits of McCarty's municipal and supervisor liability claims, however, because we conclude each is barred by limitations.

The statute of limitations period for a § 1983 claim is dictated by the personal injury statute of limitations in the state in which the claim arose, Wallace v. Kato, 549 U.S. 384, 387 (2007), and in Oklahoma, that period is two years.  12 Okla. Stat. tit. 12, § 95(A)(3).  Federal law governs when the action accrues. Kripp v. Luton, 466 F.3d 1171, 1175 (10th Cir. 2006).  A § 1983 claim for failure to train or supervise begins to run when the facts that would support a cause of action are or should be apparent.  Fogle v. Pierson, 435 F.3d 1252, 1258 (10th Cir. 2006); see also Calia v. Morrison, 54 F.3d 787 (10th Cir. 1995) (unpublished opinion).  Here, McCarty's claims for failure to train or supervise accrued when he knew or should have known that Gilchrist had testified falsely during his 1986 and 1989 trials, that evidence had been withheld during his 1986 and 1989 trials, and that Gilchrist had destroyed evidence in 2000.

When the § 1983 claim is based on an allegedly unconstitutional conviction

or other harm that, if determined to be unlawful, would render a conviction or

sentence invalid, accrual is delayed until the conviction or sentence has been

invalidated.  Heck v. Humphrey, 512 U.S. 477, 486-87 (1994).[4]  The parties agree

that Heck precluded McCarty from pursuing his § 1983 claims against Chief Citty

and Oklahoma City until his outstanding criminal conviction was "reversed on

direct appeal, expunged by executive order, declared invalid by a state tribunal

authorized to make such determination, or called into question by a federal court's

issuance of a writ of habeas corpus."  Heck, 512 U.S. at 487.  The parties disagree,

however, as to whether the date of accrual is June 14, 2005, when the OCCA

issued its opinion reversing McCarty's conviction, or March 6, 2006, when the

OCCA issued a mandate in the case.  If the date of the opinion constitutes reversal

of McCarty's conviction for purposes of lifting the Heck bar, then McCarty's

claims for municipal and supervisor liability are time-barred.  McCarty contends

that decisions of the OCCA are not final until a mandate is issued, while Chief

---

[4]Although the determination of when the Heck bar was lifted applies to all McCarty's claims, we do not reach the statute of limitations issue with respect to McCarty's § 1983 malicious prosecution claims.  We do note, however, that in addition to the Heck bar issue, assessing when the statute of limitations for McCarty's § 1983 malicious prosecution claims began to run raises additional questions.  The statute of limitations for a § 1983 malicious prosecution claim does not begin to run until the prior criminal proceeding is terminated in favor of the accused, Mondragón v. Thompson, 519 F.3d 1078, 1083 (10th Cir. 2008), and it is not clear whether favorable termination means the dismissal of all charges against the defendant or the reversal of an outstanding criminal conviction.  Compare id. (equating favorable termination with the dismissal of charges), with Smith v. Gonzales, 222 F.3d 1220, 1222-23 (10th Cir. 2000) (equating favorable termination with the reversal of an outstanding criminal conviction).

Citty and Oklahoma City argue that decisions in postconviction relief proceedings,

unlike decisions in "regular appeals," are final when the OCCA files its opinion.

See Okla. Crim. App. R. 1.13(H) (defining "post-conviction remedies" as those

available "after the regular appeal period has lapsed or mandate issued").

In "regular appeals" before the OCCA, the decision of the court is not final

until 20 days after the filing of the decision in order to give the parties time to file

a petition for rehearing.  See Okla. Crim. App. R. 3.14(D); see also Okla. Crim.

App. R. 1.2(A).  If the parties fail to file a petition for rehearing within the 20

days, the decision is final.  Id.  But see Yates v. Brock, 521 P.2d 1396, 1400

(1974) (holding that the decision of the court in a "regular appeal" is not final

until the mandate is issued under the 1974 version of the OCCA Rules).  In

contrast, in postconviction relief proceedings, petitions for rehearing cannot be

filed.  Okla. Crim. App. R. 5.5.  Once the OCCA has "rendered its decision on a

post-conviction appeal, that decision shall constitute a final order and the

petitioner's state remedies will be deemed exhausted on all issues raised in the

petition in error, brief and any prior appeals."  Okla. Crim. App. R. 5.5.

McCarty argues that the OCCA decision could not have been effective to

reverse his conviction until the mandate was issued because the mandate was

needed to transfer jurisdiction to the trial court.  See Yates, 521 P.2d at 1400.

Regardless of whether it was appropriate under Oklahoma law for the District

Court of Oklahoma County to issue orders in the case and conduct hearings before

-18-

the OCCA issued a mandate in the case, which it did, the jurisdiction of the court over McCarty's criminal proceeding has no bearing on the accrual date of this action under federal law.  For purposes of the accrual date, the dispositive question is when McCarty's conviction was no longer outstanding.  <u>Heck</u>, 512 U.S. at 486-87.  Upon the filing of the decision on June 14, 2005, McCarty was no longer barred by <u>Heck</u> from filing his § 1983 action.  McCarty filed this action on December 7, 2007, beyond the two-year statute of limitations period, and thus his claims for municipal liability and supervisor liability are time-barred.

## III.

The decision of the district court dismissing McCarty's claims is affirmed.

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT
# OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

July 14, 2011

Douglas E. Cressler
Chief Deputy Clerk


Mr. Anthony Lee Allen
Mr. Scott A. Graham
Graham, Allen & Brown, P.C.
Philtower Building
427 South Boston Avenue, Suite 355
Tulsa, OK 74103

Ms. Marna Swanda Franklin
Franklin Law Firm
435 North Walker, Suite 105
Oklahoma City, OK 73102

Mr. R. Thomas Seymour
Seymour & Graham, LLP
100 West 5th Street, Suite 550
Tulsa, OK 74103


**RE:     09-6220, McCarty v. Gilchrist, et al**
          Dist/Ag docket: 5:07-CV-01374-C

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 18 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:     Richard C. Smith

EAS/jm